UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD MONK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>JOHNSON & JOHNSON, WILLIAM C. WELDON, DOMINIC J. CARUSO and PETER LUTHER,<br><br>Defendants. | Civil Action No. 10-4841(FLW)(DEA) |

-----------------------------------------------------------------------------------------------------------------

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF SJUNDE AP-FONDEN FOR APPOINTMENT AS LEAD PLAINTIFF AND FOR APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL**

-----------------------------------------------------------------------------------------------------------------

| | |
|---|---|
| James E. Cecchi<br>Lindsey H. Taylor<br>CARELLA, BYRNE, CECCHI,<br>OLSTEIN, BRODY & AGNELLO, P.C.<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>(973) 994-1700<br>*Proposed Liaison Counsel* | Sean M. Handler<br>Darren J. Check<br>Naumon A. Amjed<br>BARROWAY TOPAZ KESSLER<br>MELTZER & CHECK, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>(610) 667-7706<br>*Counsel for Sjunde AP-Fonden*<br>*and Proposed Lead Counsel* |

Case 3:10-cv-04841-FLW -DEA   Document 3-1   Filed 11/22/10   Page 2 of 15 PageID: 45

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........ ii
II. FACTUAL BACKGROUND ........ 3
A. Summary of the Action ........ 3
B. Defendants' Scheme to Conceal Defects in JNJ's Products ........ 3
III. ARGUMENT ........ 5
- A. The PSLRA's Lead Plaintiff Provisions ........ 5
- B. AP7 Is the "Most Adequate Plaintiff" ........ 6
  - 1. AP7 Has the Largest Financial Interest in the Relief Sought By the Class ........ 6
  - 2. AP7 Satisfies Rule 23 ........ 6
- C. AP7 Is the Prototypical Lead Plaintiff Envisioned By the PSLRA ........ 8
- D. The Court Should Approve AP7's Selection of Counsel ........ 9

IV. CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Cases**

*Fields v. Biomatrix, Inc.*, 198 F.R.D. 451 (D.N.J. 2000) .......................................................... 2, 7, 9
*In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d 562 (D.N.J. 2006) ................................................. 2, 7
*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) ............................................................................. 9
*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)....................................................... passim
*In re Nice Sys., Ltd. Sec. Litig.*, 188 F.R.D. 206 (D.N.J. 1999) ...................................................... 8
*In re Olsten Corp. Sec. Litig.*, 181 F.R.D. 218 (E.D.N.Y. 1998).................................................... 8

**Statutes**

15 U.S.C. § 78u-4(a)(1) ................................................................................................................... 5
15 U.S.C. § 78u-4(a)(3)(A)-(B). ...................................................................................................... 6
15 U.S.C. § 78u-4(a)(3)(A)(i) .......................................................................................................... 5
15 U.S.C. § 78u-4(a)(3)(A)(i)(II) ..................................................................................................... 5
15 U.S.C. § 78u-4(a)(3)(B) ...................................................................................................... 1, 3, 6
15 U.S.C. § 78u-4(a)(3)(B)(i) .......................................................................................................... 5
15 U.S.C. § 78u-4(a)(3)(B)(iii) ........................................................................................................ 6
15 U.S.C. § 78u-4(a)(3)(B)(v) ...................................................................................................... 2, 9

**Rules**

Fed.R.Civ.P. 23(a) ........................................................................................................................... 6

## I. PRELIMINARY STATEMENT

Sjunde AP-Fonden ("AP7") respectfully moves this Court pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA" or the "Act"), 15 U.S.C. § 78u-4(a)(3)(B), for an Order: (i) appointing AP7 as Lead Plaintiff; (ii) approving its selection of the law firm of Barroway Topaz Kessler Meltzer & Check, LLP ("Barroway Topaz") to serve as Lead Counsel; (iii) approving its selection of the law firm of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne") to serve as Liaison Counsel; and (iv) granting such other and further relief as the Court may deem just and proper.

The relief sought by AP7 is precisely what the framers of the PSLRA sought to accomplish by enacting the Act's lead plaintiff provision, i.e. to have complex class actions arising under the federal securities laws controlled by a large institutional plaintiff. As Congress noted in the Statement of Managers, the PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs" because, among other reasons, institutional investors, such as AP7, and other class members with large amounts at stake "will represent the interests of the plaintiff class more effectively than class members with small amounts at stake." Conference Report on Securities Litigation Reform, H.R. Conf. Rep. No. 104-369, 1995 WL 709276 at 32; S. Rep. No. 104-98 (1995), 1995 WL 372783. AP7, with billions of dollars in assets under management, is exactly the type of movant envisioned by Congress as the most adequate plaintiff to lead securities class action suits.

As detailed in its certification and loss chart submitted herewith, between October 14, 2008 and July 21, 2010 (the "Class Period"), AP7 suffered losses exceeding $2.9 million in connection with its transactions in Johnson & Johnson ("JNJ" or the "Company") stock. *See* Declaration of James E. Cecchi in Support of the Motion of Sjunde AP-Fonden ("AP7") for Appointment as Lead

Plaintiff and for Approval of Its Selection of Lead Counsel and Liaison Counsel ("Cecchi Decl.") at Exs. A & B, submitted herewith. In addition to evidencing AP7's significant stake in the outcome of this litigation, AP7's certification demonstrates its desire to serve as lead plaintiff in this action, as well as its understanding of the attendant duties and obligations of serving in such a role. *See id.* at Ex. A.

AP7 believes that its financial interest in this action is the largest of any class member seeking appointment as lead plaintiff in this action. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001). AP7 is not aware of any other class member that has filed an action or a motion for appointment as lead plaintiff that suffered greater losses due to defendants' fraud. In addition, AP7 satisfies each of the applicable requirements of the PSLRA and Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and, therefore, is qualified for appointment as lead plaintiff in this action. *See In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d 562, 566-67 (D.N.J. 2006) (discussing criteria for selecting a lead plaintiff under the PSLRA). Thus, pursuant to the PSLRA's lead plaintiff provision, AP7 is presumptively the most adequate plaintiff and should be appointed Lead Plaintiff for the class.

Additionally, AP7 respectfully requests that the Court approve its selection of Barroway Topaz as Lead Counsel for the Class and Carella Byrne as Liaison Counsel for the Class. *See Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 461 (D.N.J. 2000) ("The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.") (quoting 15 U.S.C. § 78u-4(a)(3)(B)(v)). Both firms are qualified to serve in this capacity and are presently serving as lead and liaison counsel in *Security Police & Fire Professionals of America Retirement Fund v. Pfizer, Inc.*, No. 10-3105 (D.N.J.), which is pending before the Honorable Susan D. Wigenton. *See* Cecchi Decl, Ex. C.

## II. FACTUAL BACKGROUND

### A. Summary of the Action

The above-captioned matter is a securities class action lawsuit brought on behalf of all persons who purchased securities issued by JNJ during the Class Period. The action asserts claims against JNJ and certain of its executive officers ("Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the PSLRA (15 U.S.C. §§ 78j(b) and 78(t)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

JNJ is a New Jersey corporation with its principal executive offices located in New Brunswick, New Jersey. The Company engages in the research, development, manufacture, and sale of various products in the health care field worldwide, including Tylenol, Motrin, Zyrtec, and Benadryl brand products. The Company is organized into three business segments: Consumer, Pharmaceutical and Medical Devices and Diagnostics. The Consumer segment includes nutritional and over-the-counter pharmaceutical products. Tylenol and Motrin are produced and marketed by McNeil Consumer Healthcare ("McNeil"), a division of JNJ.

### B. Defendants' Scheme to Conceal Defects in JNJ's Products

The Class Period begins on October 14, 2008 with the release of JNJ's financial results for the third quarter of 2008. In this announcement, the Company commented on the Consumer segment's strong sales and its domestic and international sales growth. Similar statements touting the robust growth and revenue of the Company's Consumer segment were made throughout the Class Period. These statements were, however, materially false and misleading. Specifically, the Company's Class Period statements did not inform investors about serious product defects and quality control problems across several of JNJ's plants and products. When some problems were

3

identified by the FDA in early 2010, JNJ assured investors that the matter would be fully investigated. According to defendant William C. Weldon, JNJ's CEO, "nothing is more important to us than the health and safety of the people who use our products."

On April 30, 2010, investors slowly began to learn the truth about JNJ's operations when the Company recalled several products including Children's Tylenol, Infants' Tylenol and Children's Motrin. It was eventually revealed that the recall included over 136 million bottles of JNJ's over-the-counter drugs.

Congressional hearings held shortly after the children's medicines were recalled disclosed significant details about the Company's actual Class Period operations. On May 27, 2010, the House Committee on Oversight and Government Reform held a hearing regarding JNJ's recall. During the hearing, Committee Chairman Edolphus Towns noted that:

> [l]ess than a month ago a Johnson & Johnson company known as McNeil Consumer Healthcare recalled over 40 variations of children's medicine.… McNeil received dozens of consumer complaints about foreign particles in children's medicine, which were later confirmed by McNeil. In addition, tests at the plant show that three batches of Infant's Tylenol were found to be 'super potent,' meaning that they contained an overdose of the active ingredient…. The FDA is also currently reviewing reports of children who died to determine if there is any connection between those deaths and this recall…. Just last night, the Committee obtained from the FDA even more disturbing information. According to an FDA document, McNeil knew there was a potential problem with one of its Motrin products that was on the market in 2008, ***but rather than issue a public recall, McNeil allegedly sent contractors out to stores to buy the product back and told the stores 'not to mention' a recall***. After the FDA confronted McNeil about this, McNeil announced a recall of the affected products. This 'phantom recall' warrants further investigation by this Committee. Who at McNeil and Johnson & Johnson knew about this scheme? How high up in the corporate suite was ***this scheme hatched***? Is this a standard operating practice for McNeil?

(Emphasis added).

In addition to Congressional investigations, the Company's actions have exposed it to potential criminal liability.

4

The foregoing disclosures materially impacted JNJ's stock price. Based on the news beginning with the announcement of the April 30, 2010 recall, the Company's stock declined 12 percent from an April 29, 2010 close at $65.01 per share to a July 21, 2010 close at $57.12 per share. The decline is directly related to the market incorporating corrective news into the price of JNJ's stock.

## III. ARGUMENT

### A. The PSLRA's Lead Plaintiff Provisions

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). First, the plaintiff who files the initial action must publish a notice to the class within twenty days, informing class members of their right to file a motion for appointment as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i). Here, in connection with the above-captioned action, notice was published on *PRNewswire* on September 21, 2010. *See* Cecchi Decl., Ex. D. Second, within sixty days of the publication of notice, any member of the proposed class may apply to be appointed as lead plaintiff, whether or not they have previously filed a complaint in this action. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Third, within ninety days after publication of notice, courts shall consider any motion made by a class member and shall appoint as lead plaintiff the member or members of the class that the court determines to be most capable of adequately representing the interests of class members. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this [Act] is the person or group of persons that –

> (aa) has either filed the complaint or made a motion in response to a notice…;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23.

15 U.S.C. § 78u-4(a)(3)(B)(iii); *Cendant*, 264 F.3d at 263.

The time period in which class members may move to be appointed lead plaintiff in this case expires November 22, 2010. *See* 15 U.S.C. § 78u-4(a)(3)(A)-(B). Pursuant to the PSLRA, and within the requisite time frame after publication of the required notice, AP7 has timely moved to be appointed lead plaintiff on behalf of all members of the class and otherwise meets all the criteria to be appointed lead plaintiff.

### B. AP7 Is the "Most Adequate Plaintiff"

#### 1. AP7 Has the Largest Financial Interest in the Relief Sought By the Class

AP7 suffered losses exceeding $2.9 million in connection with its Class Period purchases of JNJ stock. *See* Cecchi Decl., Ex. B. To the best of its knowledge, this represents the largest financial interest in the relief sought by the class. *See Cendant*, 264 F.3d at 262.

#### 2. AP7 Satisfies Rule 23

In addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B). Rule 23(a) provides that a party may serve as a class representative if the following four requirements are satisfied: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

6

Although Rule 23 consists of four requirements, at this stage of the litigation, only a preliminary showing of typicality and adequacy is required. *See Cendant*, 264 F.3d at 263 ("The initial inquiry … should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy").

### a. AP7 Is Typical

The typicality requirement under Rule 23 is satisfied if the movant's claims "arise from the same event or practice or course of conduct that gives rise to the claims of the class members and the claims are based on the same legal theory." *Biomatrix*, 198 F.R.D. at 456 (internal quotations omitted). The claims of the lead plaintiff, however, need not be identical to the claims of the class to satisfy typicality.

Here, AP7 is typical because, just like all other class members asserting claims under the Exchange Act, it: (1) purchased or otherwise acquired JNJ securities during the Class Period; (2) at prices allegedly artificially inflated by Defendants' materially false and misleading statements and/or omissions; and (3) suffered damages when corrective disclosures removed the inflation created by Defendants' fraud causing the price of JNJ's securities to fall. *See Able*, 425 F. Supp. 2d at 567. Thus, AP7's claims are typical of those of other class members because its claims and the class's claims arise out of the same course of events. *See Biomatrix*, 198 F.R.D. at 457.

### b. AP7 Is Adequate

AP7 also satisfies the adequacy requirement of Rule 23 which requires that the representative party "fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B). Specifically, the adequacy requirement is met when: "(1) the plaintiff's attorney [is] qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff [does] not have interests antagonistic to the class." *In re Nice Sys., Ltd. Sec. Litig.*, 188 F.R.D. 206, 219 (D.N.J.

1999). AP7 satisfies these elements and, therefore, meets the adequacy requirement of Rule 23. First, as explained below, AP7 has selected two highly qualified firms with significant experience prosecuting class action lawsuits under the federal securities laws to serve as lead and liaison counsel for the class. *See infra* Section D. Second, there is no conflict between AP7 and the class. Both AP7 and the class seek to recover losses caused by Defendants' fraud. Furthermore, AP7, with losses exceeding $2.9 million from its Class Period transactions in JNJ common stock, has a substantial financial interest in this action and is committed to vigorously advocating the class's claims, as evidenced by its sworn certification. *See* Cecchi Decl., Exs. A & B. Finally, AP7 has in place a fee agreement with its proposed lead counsel. *See Cendant*, 264 F.3d at 265. As noted by the court in *Cendant*, "one of the best ways for a court to ensure that it will fairly and adequately represent the interests of the class is to inquire whether the [lead plaintiff] movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel." *Id.*

### C. AP7 Is the Prototypical Lead Plaintiff Envisioned By the PSLRA

In addition to satisfying the preliminary requirements of Rule 23, the appointment of AP7 as Lead Plaintiff also fulfills a critical legislative goal behind enacting the PSLRA: to encourage sophisticated institutions with large financial interests to serve as lead plaintiff in securities class actions. *See Cendant*, 264 F.3d at 264; *see also In re Olsten Corp. Sec. Litig.*, 181 F.R.D. 218, 220-21 (E.D.N.Y. 1998) ("By establishing the presumptive criterion that the most adequate plaintiff is the one who 'has the largest financial interest in the relief sought by the class,' … Congress intended 'to increase the likelihood that institutional investors will serve as lead plaintiffs. . . .'"). AP7 is exactly the type of large institutional investor envisioned by Congress to serve as lead plaintiff when enacting the PSLRA. AP7 is one of Sweden's state pension funds and has over $14 billion in assets

8

under management. *See Cendant*, 264 F.3d at 264 ("[I]nstitutional investors . . . with large losses will, more often than not, satisfy the typicality and adequacy requirements…"). AP7's sophistication assures the class that it can, and will, adequately litigate this action and supervise class counsel. Thus, AP7 is clearly a suitable—and indeed preferred—lead plaintiff.

### D.     The Court Should Approve AP7's Selection of Counsel

The party selected to serve as lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." *See* 15 U.S.C. § 78u-4(a)(3)(B)(v); *see also Biomatrix, Inc.*, 198 F.R.D. at 461; *In re Cavanaugh*, 306 F.3d 726, 734 (9th Cir. 2002) ("Selecting a lawyer in whom a litigant has confidence is an important client prerogative and we will not lightly infer that Congress meant to take away this prerogative from securities plaintiffs. And, indeed, it did not. While the appointment of counsel is made subject to the approval of the court, the Reform Act clearly leaves the choice of class counsel in the hands of the lead plaintiff."). AP7 has selected and retained Barroway Topaz to serve as Lead Counsel for the Class and Carella Byrne to serve as Liaison Counsel for the Class. These firms have extensive experience in prosecuting complex class actions and are well qualified to represent the Class. *See* Cecchi Decl. at Exs. E & F.

Barroway Topaz has specialized in prosecuting securities class action litigation for over twenty years and has emerged as one of the preeminent law firms in its field and is currently serving as lead or co-lead counsel in several high profile securities class actions including, *In re Bank of America Corp. Sec. Litig.*, No. 09-md-2058 (S.D.N.Y.) and *Security Police & Fire Professionals of America Retirement Fund v. Pfizer, Inc.*, No. 10-3105 (D.N.J.). Barroway Topaz has represented defrauded investors in numerous class actions recovering billions of dollars for injured class members. Noteworthy achievements include serving as lead (or co-lead) counsel in complex securities fraud cases such as *In re Tyco International, Ltd. Sec. Litig.*, No. 02-266-PB (D.N.H.), *In*

9

*re Tenet Healthcare Corp. Sec. Litig.*, No. 02-8462 (C.D. Cal.), and *In re AremisSoft Corp. Sec. Litig.*, No. 01-2486 (D.N.J.). *See* Cecchi Decl. at Ex. E. In addition, Carella Byrne has significant experience litigating complex actions, including class actions involving a broad and varied range of issues including federal securities laws. As such, Carella Byrne is more than capable of performing the duties of Liaison Counsel. *See* Cecchi Decl. at Ex. F. Furthermore, Barroway Topaz and Carella Byrne are presently serving as lead and liaison counsel in *Security Police & Fire Professionals of America Retirement Fund v. Pfizer, Inc.*, No. 10-3105 (D.N.J.), which is pending before the Honorable Susan D. Wigenton. Thus, the Court can be assured that by granting this motion, the proposed class will receive the highest caliber of legal representation.

**IV.   CONCLUSION**

For the foregoing reasons, AP7 respectfully requests that the Court: (1) appoint AP7 as Lead Plaintiff for the Class; (2) approve its selection of Barroway Topaz to serve as Lead Counsel for the Class; and (3) approve its selection of Carella Byrne to serve as Liaison Counsel for the Class.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
*Proposed Liaison Counsel*

By:     /s/ James E. Cecchi
          JAMES E. CECCHI

Dated: November 22, 2010

Sean M. Handler
Darren J. Check
Naumon A. Amjed
BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
(610)667-7706
*Counsel for Sjunde AP-Fonden
and Proposed Lead Counsel*

10

11