**\*\*\* NOT FOR PUBLICATION  \*\*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RONALD MONK, Individually and on Behalf of All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Civil Action No. 10-4841 (FLW) |
| vs. | : : | **OPINION** |
| JOHNSON & JOHNSON,   WILLIAM C. WELDON,   DOMINIC J. CARUSO, COLLEEN A. GOGGINS, and PETER LUTHER, | : : : : : | |
| Defendants. | : : | |

**WOLFSON,  United States District Judge:**

This securities fraud putative class action complaint includes allegations that certain former and current officers and directors of Johnson & Johnson ("J&J"), and J&J's wholly-owned subsidiary McNeil-PPC, Inc. ("McNeil"),  in their communications with and to shareholders, misrepresented and omitted material information about systemic quality control failures at McNeil's over-the-counter ("OTC") drug manufacturing plants.  Defendants, J&J, William C. Weldon, Dominic J. Caruso, Colleen A. Goggins, and Peter Luther (collectively, "Defendants") now move to dismiss Plaintiff Ronald Monk's ("Plaintiff's") Amended Complaint, for failure to allege that each defendant possessed the requisite scienter to commit securities fraud.  Applying

the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C § 78u et seq., I conclude that Plaintiff has sufficiently pled scienter with respect to Defendants J&J, Goggins, and Caruso.  Plaintiff's scienter allegations against Defendants Weldon and Luther, however, are insufficient; hence those defendants are dismissed from this suit without prejudice and Plaintiff is granted leave to file a Second Amended Complaint in accordance with the dictates of this Opinion.

## I.    BACKGROUND

### A.    Facts

As I must on a motion to dismiss, I take Plaintiff's allegations as true. The Amended Complaint totals 114 pages, and contains 298 numbered paragraphs of facts relating to recalls of OTC medicines manufactured by McNeil as well as the closure of McNeil's Fort Washington, Pennsylvania manufacturing plant.  In this background section, I provide an overview of the extensive allegations found in the Amended Complaint and provide further detail about Plaintiff's allegations, where appropriate, in connection with my analysis later in this Opinion.

J&J is a Fortune 500 global health care company incorporated in New Jersey that consists of numerous subsidiaries.  See Am.Compl., ¶ 23.  Through its subsidiaries, J&J manufactures and sells consumer packaged goods, medical devices, and pharmaceutical products.  Id. The pharmaceutical segment of J&J's business accounts for approximately 36% of J&J's sales, the consumer segment accounts for 38%, and the medical devices segment accounts for 26%.  Id. at ¶ 29.

McNeil is one of J&J's wholly-owned subsidiaries that sells OTC pharmaceutical products. According to the Amended Complaint, prior to 2007, J&J regulated the manufacture and quality assurance for its subsidiaries' OTC medicines through the pharmaceutical segment.  Id. at ¶ 31.  While seated within the pharmaceutical segment, Plaintiff alleges, the OTC products were subjected to rigorous quality control procedures similar to those to which J&J subjected it prescription medications.  Id. at p. 32.

In or around January of 2007, Plaintiff alleges that J&J acquired Pfizer Consumer Healthcare ("PCH"), along with PCH's popular OTC medicines—Sudafed, Benadryl, and Zyrtec.  Id. at ¶ 36.  Following the PCH acquisition, according to the Amended Complaint, J&J shifted the regulation and quality assurance of OTC medicines from the rigorous pharmaceutical segment to the less-experienced consumer products segment.  Id. at ¶ 35-37.  The consumer division was run by Defendant Colleen Goggins, J&J's Worldwide Chairman of the division, who allegedly had no pharmaceutical background but, rather, "made baby shampoo all her life." Id. at ¶ 38. Nevertheless, McNeil proved to be profitable for J&J, generating more than twice the typical 10 percent margin that other J&J subsidiaries generated.  Id. at ¶ 56.

Plaintiff's allegations center on two McNeil facilities at which quality control problems arose during the Class Period of October 14, 2008 through July 21, 2010—the Las Piedras Puerto Rico plant, and the Fort Washington, Pennsylvania plant. Plaintiff's allegations, further, focus on two types of recalls that related to OTC products produced at those plants.  The first type of recall is termed as a "phantom

recall" of Motrin products.  The second type is a traditional recall of various Tylenol-related medicines and children's medicine products.  I address each in turn.

### 1.    Phantom Recall Allegations

Plaintiff alleges that, on November 20, 2008 at McNeil's Puerto Rico plant, J&J discovered that a batch of Motrin tablets failed to dissolve at the appropriate rate; the tablets dissolved too slowly and were, therefore, less effective.  See id. at ¶¶  63, 73.  While McNeil notified the Food and Drug Administration ("FDA") about the product failure, id., McNeil allegedly surreptitiously orchestrated a scheme to remove the defective product from stores' shelves without notifying the public of the defect.  Id. at ¶ 64.  According to the Amended Complaint, in March of 2009, McNeil hired a third-party contractor, Inmar, to engage in what the Plaintiff terms a "phantom recall" of the product by purchasing it from store shelves.  Id. at ¶ 65.  Notably, the Amended Complaint alleges that Defendant Peter Luther, the President of McNeil, was aware of the phantom recall because he directed McNeil employees, in an internal J&J memo, to "make this happen ASAP."  Id. at ¶ 69.  Once the FDA became aware of the phantom recall, Plaintiff alleges, the FDA expressed its disapproval in a July 16, 2009 email stating that "it seems your company is doing a recall even though you are calling it a retrieval."  Id. at ¶ 72.

The phantom recall was not publically announced until over a year after it had been completed.  At a hearing before the U.S. House of Representatives Committee on Oversight and Government Reform ("Committee") held on May 27, 2010 ("May Congressional Hearing"), Representative Edolphus Towns, Chairman of the

Committee, questioned Defendant Goggins about the phantom recall.  See Phillips Decl., Exh. A ("May Cong. Hrg.") at 29.  While Defendant Goggins acknowledged that she was aware of McNeil's hiring of Inmar, she testified that she was under the false impression that Inmar was merely taking inventory of what Motrin product remained on the shelves.  She was not aware that Inmar was purchasing the product as part of a phantom recall.  Id.

A second hearing was held on September 30, 2011 ("September Congressional Hearing"), at which Defendant Goggins and Defendant Weldon appeared.  See Hearing of the House Committee on Oversight and Government Reform, Johnson & Johnson's Recall of Children's Tylenol and other Children's Medicines and the Phantom Recall of Motrin (Part 2), September 30, 2010.[1]  At that hearing, Goggins confirmed that she did not know about the phantom recall until she was advised of it by Representative Towns at the May Congressional Hearing.  Weldon acknowledged the phantom recall at the hearing, noting that he believed the "McNeil personnel were trying to be transparent with the FDA, . . .[n]onetheless, based on what I have learned since the May hearing, including the points that this committee brought to light, it is clear to me that in retrospect, McNeil should have handled things differently ...."  Id. at 8.  Moreover, the Amended Complaint alleges, Weldon admitted that "we made a mistake. We should have notified them that we would be taking these products . . . off the

---

[1]     While this document was not submitted by the parties, the Court may take judicial notice of it on this motion because it is a publically available document that is referenced in the Amended Complaint.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted).

shelves." Id., ¶ 246 (emphasis omitted).

Plaintiff further alleges that, throughout the Class Period, the Defendants made several misrepresentations and omissions about the phantom recall, which ultimately caused J&J's stock prices to decline when the phantom recall was made public and became the subject of critical news reporting.  One example is Defendant Goggins' statement at the May Congressional Hearing that she had no knowledge of the recall aspect of the Motrin retrieval.  See id. at ¶ 260.  In Plaintiff's view, Goggins' testimony was false in light of the internal J&J memo between Luther and other J&J executives planning the phantom recall; because those individuals knew, Goggins must have also known or she consciously disregarded the facts in her role as the head of the consumer products group.  Id. at ¶ 259-60.  This, of course, is only one example.  Additional examples detailed in the Amended Complaint will be discussed in connection with my analysis below.

### 2.    Tylenol-related Recalls

According to the Amended Complaint, J&J's and McNeil's inadequate quality assurance oversight, and J&J's unabated drive to lower costs at the expense of patient safety, caused J&J to recall multiple OTC medicines during the Class Period.  The first of these recalls was for the Tylenol product.

Starting in April 2008, J&J began receiving complaints that its Tylenol and other OTC medicines had a musty odor that induced nausea.  Am.Compl., ¶ 76. According to the Amended Complaint, a confidential informant ("CW1") states that J&J conducted an internal investigation.  Id.  Despite conducting the investigation,

Plaintiff further alleges, J&J failed to initially notify the FDA about the problem. Over a year later, on November 6, 2009, J&J began receiving similar complaints about another Tylenol product, Tylenol Arthritis. J&J discovered that the musty odor emanated from wooden pallets that transported and stored packaging materials at the Puerto Rico plant. Id. at ¶¶ 77, 175.

Meanwhile, on January 8, 2010, the FDA issued a Form 483 Inspectional Observations report to McNeil that highlighted deficiencies at the Puerto Rico plant. Id. at ¶ 174. The report indicated, among other things, that there had been several product mix-ups where, for example, Tylenol PM Geltabs were mixed in with Children's Tylenol Meltaway packages. According to the Amended Complaint, the FDA noted that product mix-up was a "recurrent observation" and that there was "no assurance" that McNeil was taking the appropriate preventative and corrective actions. Id.

Thereafter, on January 15, 2010, McNeil announced its recall of the Motrin and Benadryl brands, again due to the musty odor, id. at ¶ 78, and, on that same date, the FDA sent a warning letter to Defendants Weldon and Luther, documenting deficiencies at both the Fort Washington plant and the Puerto Rico plant, from which the musty odor problem originated. Id. at ¶ 175. The warning letter stated that J&J "did not conduct a timely, comprehensive investigation," id. at p. 81, and that the FDA was "concerned about the response of Johnson & Johnson (J&J) to this matter . . . Neither upper management at J&J nor at McNeil . . . assured timely investigation and resolution of the issues." Id. at ¶ 84.

7

### 3.   Children's Medicine Recall

According to the Amended Complaint, from June of 2009 through April 2010, the Fort Washington plant received consumer complaints about several children OTC products, including pediatric versions of Tylenol, Motrin, Zyrtec, and Benadryl. Id. at ¶¶ 87, 90. These complaints stated that there were "foreign materials, black or dark specs" in the medicines. Id. at ¶ 90. As noted, the January 15, 2010 FDA warning letter referenced manufacturing problems at the Fort Washington plant where these medicines were produced. Ultimately, on April 30, 2010, J&J recalled more than 136 million bottles of children's OTC medicines, id. at ¶ 87, and, on May 4, 2010, J&J closed the Fort Washington plant. Id. at ¶ 91. Several months later, on July 20, 2010, Defendants disclosed that the closing of the plant would cost J&J $600 million in sales during 2010. Id. at ¶ 229. In addition, Defendants disclosed that the U.S. Attorney's Office for the Eastern District of Pennsylvania had issued a grand jury subpoena regarding the recalls[2]. Id. at ¶ 100.

Plaintiff alleges that it was not until J&J received the January 15, 2010 FDA warning letter that it chose to initiate the recall, yet a McNeil spokesperson stated that it was J&J's investigation of consumer complaints that led to the recall. Id. at ¶ 88. While Plaintiff alleges that this McNeil statement is misleading, it is not clear from the Amended Complaint, however, that any of the Defendants in this action made that

---

[2]     In March of 2011, the U.S. Attorney's Office and McNeil entered into a Consent Decree of Permanent Injunction which prohibited the Fort Washington plant from reopening until brought into strict compliance with the FDA's directives. See id. at ¶ 105.

statement.  Id.

As with the phantom recall allegations, Plaintiff alleges that recall of the children's medicines was discussed at the May Congressional Hearing.  Several congressmen and women expressed their concern over the recall, with Chairman and Representative Towns noting that J&J's actions "paint[ ] a picture of a company that is deceptive, dishonest, and has risked the health of many of our children."  Id. at ¶ 96. The topic was, again, addressed at the September Congressional Hearing, where Defendant Weldon stated that "in 2008, there were adverse events that we knew."  Id. at ¶ 104; Sept. Cong. Hrg. at 20.  Plaintiff alleges that this statement fails to acknowledge, i.e., omits, the true cause of the recalls—J&J's alleged reckless cost-cutting practices.  Id. at ¶ 104.

Plaintiff further alleges that Defendant Dominic J. Caruso misrepresented the systemic nature of the quality control problems at McNeil, by stating in a May 11, 2010 investor conference that McNeil's deficiencies were limited to the Fort Washington plant.  See id. at¶ 11.  Finally, the Amended Complaint includes allegations that the Defendants misrepresented, and omitted from their public statements, that J&J engaged in reckless cost cutting that sacrificed the quality of the OTC products produced at both McNeil plants.  See e.g., Am.Compl., ¶ 251 (discussing Defendant Caruso).  In Plaintiff's view, the Defendants were obligated to inform shareholders about the extent of J&J's cost-cutting practices, and that all statements suggesting that J&J was successful or profitable are misleading.  See e.g., id. at ¶ 179.  Plaintiff further alleges that statements failing to acknowledge that McNeil's product recalls

9

were a result of the cost-cutting practices is also misleading.  See e.g., id. at ¶ 251.

Lastly, I note here Plaintiff's allegation that FDA's compliance staff held a meeting with Defendants Goggins and Luther "and other Company executives" on February 19, 2010.  Id. at ¶ 186.  At that meeting, the FDA challenged J&J's and McNeil's response to the quality control problems at McNeil's Puerto Rico plant, and queried whether there was a culture of compliance at J&J.  Id. at ¶¶ 186, 189.  Other than alleging that Defendants Goggins and Luther attended the meeting, the Amended Complaint does not specify which executives were present.

In addition, the Amended Complaint includes allegations from six confidential witnesses, CW1 through CW6.  These witnesses include CW1, a former Quality Control Manager at McNeil who worked during 2007 and 2008 as a supervisor of McNeil quality control employees.  Id. at ¶ 32.  CW2 is described in the Amended Complaint as an employee who reported to a Former Director of Quality at McNeil, Bob Miller. Id. at ¶ 34.  According to the Amended Complaint, CW3 is a former Direct of Quality at McNeil who worked there from early 2005 through early 2008.  Id. at ¶ 41.  CW4 is described as a former "Risk Management" employee who worked in the Quality Assurance department at McNeil for many years, through 2008.  Id. at ¶ 49.  In addition, CW5 is described as "a former McNeil Quality Assurance Supervisor from 2000 through early 2009 who was responsible for cGMP compliance and investigations of quality control at McNeil."  Id. at ¶ 52.  The Amended Complaint describes CW6 as a former J&J employee who worked in McNeil's Quality Assurance Science department from 2007 through late 2010.  Id. at ¶ 89.  Most of these allegations revolve around

10

observations the confidential witnesses made while employed at McNeil or J&J and, in some instances, conversations they participated in or overhead amongst their fellow employees and supervisors.  The confidential witness statements are discussed in more detail in my analysis, where relevant.

### B.  Procedural History

The instant suit was filed by Plaintiff Monk on September 21, 2010, as a putative class action, seeking to represent J&J shareholders.  Several months later, on March 11, 2011, he filed an Amended Complaint.  In the Amended Comlaint, he asserts a securities fraud claim under Rule 10b-5 against all Defendants in Count I, and a Section 20(a) claim under the Securities Exchange Act of 1934, against Defendants Weldon, Caruso, and Goggins in Count II.  Defendants jointly move to dismiss both of Plaintiff's claims.

## II.   STANDARD OF REVIEW AND LEGAL STANDARDS

### A.   Motion to Dismiss Standard

In reviewing a motion to dismiss for failure to state a claim under 12(b)(6), a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff "and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted).  In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court "retired" the language in Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless

it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Twombly</u>, 550 U.S. at 561 (quoting <u>Conley</u>, 355 U.S. at 45–46).  Rather, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 555.  In short, "a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211 (3d Cir. 2009).

### B.   Pleading Requirements of a 10b-5 Claim

### 1.   Elements of a10b-5 Claim

The Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. §77a <u>et</u> <u>seq.</u>, ("Securities Act") and The Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. §78a <u>et</u> <u>seq.</u>, were enacted, respectively, to ensure "full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof . . ." <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 725, 728 (1975), and "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets . . ." <u>Id</u>. at 728.

Rule 10b-5 provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

12

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 CFR §240.10b-5.

A cause of action under Rule 10b-5 consists of the following elements: "(1) a material misrepresentation ...; (2) scienter, i.e., [defendant's] wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to ... as 'transactional causation'; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d. Cir. 2007); In re Bradley Pharms., Inc. Secs. Litig., 421 F. Supp. 2d 822, 826 (D.N.J. 2006).   In this case, Defendants submit that Plaintiff's allegations of misrepresentations and omissions under 10(b)-5 lack allegations of a strong inference of scienter.

### 2.   PSLRA Heightened Pleading Standard

In reviewing a motion to dismiss under Fed. Civ. P. 12(b)(6), "the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." In re Intelligroup Securities Litigation,

527 F.Supp.2d 262, 275 (D.N.J. 2007); <u>Allegheny Gen. Hosp. v. Philip Morris, Inc.</u>, 228 F.3d 429, 434-35 (3d Cir.2000); <u>see also</u> Fed. R. Civ. P. 12(b)(6).[3]  However, when the allegations are grounded in fraud, this standard is heightened by Fed. R. Civ. P. 9(b). This Rule requires that allegations of fraud must be plead with particularity,[4] and it has been "rigorously applied in securities fraud cases." <u>Id</u>. (quoting <u>Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1417 (3d Cir. 1997)).

To this end, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C § 78u <u>et seq.</u> The purpose of requiring particularized pleadings is to prevent abusive securities litigations. <u>See Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007) ("Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law"); <u>Merrill Lynch, Pierce,</u>

---

[3]   As a general matter under Rule 12(b)(6), a court may not consider matters extraneous to the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56. An exception is made, however, for a "document integral to or explicitly relied upon in the complaint," and it has been long established that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1426 (internal citations omitted.) In securities fraud actions, it is equally well-established that a court may consider public filings such as quarterly and annual reports filed with the SEC, <u>Oran v. Stafford</u>, 226 F.3d 275, 289 (3d Cir. 2000), and the Supreme Court has explicitly directed courts to consider such documents in assessing whether a plaintiff has sufficiently pled scienter.  <u>See Tellabs</u>, 553 U.S. at 322.

[4]   Rule 9(b) reads, in pertinent part, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent . . .") (internal quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 252 (3d. Cir. 2009).  First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity."   Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)).  Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).[5]

---

[5]   The PSLRA states, in pertinent part:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were

Both provisions of the PSLRA require facts to be pled with "particularity." Avaya, 564 F.3d at 253.  This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) ; see Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake.").   Indeed, although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." Avaya, 564 F.3d at 253 (citations omitted).  This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." Advanta, 180 F.3d at 534 (internal quotation marks omitted).

### 3.   Scienter

---

made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(1), (2).

While the PSLRA standard is generally similar to Rule 9(b), "the PSLRA's requirement for pleading scienter . . . marks a sharp break with [the] Rule 9 ...." Id. Under § 78u-4(b)(2), "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." Id. (citing Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008)); see Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Instead, under the PSLRA's "[e]xacting" pleading standard for scienter, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Tellabs, 551 U.S. at 313 (internal quotation marks omitted).

A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 2504-05; see also id. at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences" (internal quotation marks omitted)). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 2509; see also id. at 2511 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." Id. at 2511.

Simply put, in finding scienter, "[i]t will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." <u>Avaya</u>, 564 F.3d at 269 (citing <u>South Ferry LP v. Killinger</u>, 542 F.3d 776, 784 (9th Cir. 2008) ("<u>Tellabs</u> counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.")); <u>see</u> <u>also</u> <u>In re Cabletron Sys., Inc.</u>, 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").

### 4.   Circumstantial Evidence of Conscious Misbehavior or Recklessness

A plaintiff alleging a strong inference of scienter from circumstantial evidence must sufficiently plead "defendants' knowledge of facts or access to information contradicting their public statements. . . . [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." <u>In re Campbell Soup Co. Sec. Litig.</u>, 145 F. Supp. 2d 574, 599 (D.N.J. 2001). However, where plaintiffs "choose to establish[] scienter . . . by asserting circumstantial evidence of intent or recklessness, 'the strength of the circumstantial allegations must be [even] greater.'" <u>Intelligroup</u>, 527 F.Supp. 2d at 285 (quoting <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142 (2d Cir. 2001)). The allegations of circumstantial evidence must be supported by detailing, with particularity, "the who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with

respect to defendant's state of mind. <u>Burlington</u>, 114 F.3d at 1422 (citation omitted); <u>see also</u> <u>Ronconi v. Larkin</u>, 253 F.3d 423, 437 (9th Cir. 2001) (finding that a temporal proximity of events, standing alone, is insufficient circumstantial evidence). Moreover, as noted, the totality of circumstantial facts alleged must give rise to an inference of scienter "at least as compelling as any opposing inference one could draw from the facts." <u>Tellabs</u>, 127 S. Ct. at 2510.

"Conscious misbehavior is alleged by 'stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.'" <u>Aviva Partners LLC v. Exide Techs.</u>, No. 05-3098, 2007 U.S. Dist. LEXIS 17347, at *26 (D.N.J. Mar. 13, 2007) (quotations omitted). Recklessness is conduct that represents "an extreme departure from the standards of ordinary care . . . which represents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." <u>Suprema</u>, 438 F.3d at 276.  Again, the key inquiry is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  <u>Campbell Soup</u>,145 F. Supp. 2d at 599 (quotations omitted).

### 5.    Confidential Witness Allegations

In order to rely on the statements of a confidential witness for the purpose of pleading scienter, the plaintiff must allege: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access

to the information. <u>Intelligroup</u>, 527 F.Supp.2d at 290 (citations omitted); <u>Portal Software, Inc. Secs. Litig.</u>, No. 03–5138, 2005 WL 1910923, at *9 (N.D.Cal. Aug. 10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable"). Moreover, in <u>Chubb</u>, the Third Circuit cautioned that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail. <u>See</u> <u>Chubb</u>, 394 F.3d at 146. Indeed, "failure to meet these requirements with respect to each and every confidential source the plaintiff relies upon, renders that source irrelevant for the purposes of plaintiff's allegations." <u>Intelligroup</u>, 527 F.Supp.2d. at 290; <u>see</u> <u>Chubb</u>, 394 F.3d at 146. "The sheer volume of confidential sources cited cannot compensate for these inadequacies .... Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." <u>Chubb</u>, 394 F.3d at 155.

## III. DISCUSSION

Defendants generally argue that Plaintiff's allegations are conclusory, not specific to particular defendants, and based on non-actionable corporate misconduct as opposed to a recklessness indicative of an intent to deceive. Defendants, further, separately address each individual defendant and the alleged misstatements made, or omissions, of each.[6] In response, Plaintiff argues that he sufficiently alleges that the

---

[6]   In addition, Defendants raise challenges to specific categories of allegations, including confidential witness statements recounted in the Amended

Defendants had knowledge of McNeil's phantom recall and incessant quality control problems, yet they made material misrepresentations about McNeil's problems and failed to fully inform shareholders about McNeil's problems in press releases, investor conference calls, and Congressional testimony, despite a duty to disclose the same.

As noted, to sufficiently plead scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind." Tellabs, 551 U.S. at 313 (internal quotation marks omitted).  Indeed,

> [t]o establish corporate liability for a violation of Rule 10b–5 requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."

Makor, 513 F.3d at 708.  Indeed, the Third Circuit made clear in Winer that the so-called group pleading doctrine is no longer viable, and any private securities fraud claims against corporate officers "must be pleaded with the specificity required by the PSLRA with respect to each defendant."  503 F.3d at 337.

---

Complaint, the Amended Complaint's allegations regarding cost containment strategies at McNeil, and the Amended Complaint's allegations regarding the phantom recall and other manufacturing deficiencies.  Plaintiff, likewise, argues that certain categories of allegations sufficiently create a strong inference of scienter.  In light of admonitions of the Third Circuit and the Supreme Court not to "develop separately rules of thumb for each type of scienter allegation," but to "consider the totality of circumstances" when assessing scienter allegations, Avaya, 564 F.3d at 269 (citing Killinger, 542 F.3d at 784), I will address the categories of allegations addressed by the parties in connection with my analysis of the totality of allegations made as to each specific defendant.  Accord In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig., No. 05–1151, 2011 WL 3444199 at *24-25 (Aug. 8, 2011).

Moreover, where, as here, Plaintiff's allegations rest on circumstantial evidence of each defendant's intent, such allegations must be supported by detailing, with particularity, "the who, what, when, where and how" of the events at issue and by presenting clear facts verifying Plaintiff's deductions with respect to each defendant's state of mind. Burlington, 114 F.3d at 1422 (citation omitted). Finally, this Court reiterates that my scienter ruling "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." Avaya, 564 F.3d at 269 (citing Killinger, 542 F.3d at 784. Hence the Court will consider the totality of circumstances in addressing Plaintiff's allegations against each defendant. With these principles in mind, I turn to the Amended Complaint's allegations regarding each individual officer Defendant and, lastly, J&J.[7]

## A.    Defendant Weldon

Plaintiff alleges that Defendant Weldon made several misrepresentations and omissions during the Class Period. The backdrop for these alleged misrepresentations and omissions, Plaintiff asserts, is the January 15, 2010 FDA warning letter addressed to Weldon which "put him on clear notice of the pervasive quality control problems,

---

[7]    In this regard, I note that my assessment is complicated by Plaintiff's failure to clearly set forth in his opposition papers the particular alleged misrepresentations and omissions of each defendant. By failing to delineate the allegations related to each particular defendant, the Court was burdened with combing through Plaintiff's 114-page Amended Complaint to glean the specific alleged misrepresentations and omissions attributable to each defendant.

deficiencies and violations at the McNeil Puerto Rico plant." Am. Compl., ¶ 244.  This plant, as noted <u>supra</u>, produced the Tylenol and other OTC medicines that were recalled due to a musty odor.

Against this backdrop, Plaintiff alleges that Weldon misrepresented in a January 26, 2010 press release that "[i]n a year of tremendous challenge, [J&J] maintained our long-term focus while delivering solid results…" Am.Compl., ¶ 177.[8] According to the Amended Complaint, this statement is materially false and misleading because the FDA Warning Letter suggested that J&J had not maintained a long-term focus but, to the contrary, sacrificed J&J's quality image for short-term profits. <u>Id.</u> In addition, Plaintiff's allege that Weldon stated in an analyst and investor conference call that "[w]e are very conscious of the bar we set for ourselves and that consumers expect more from us than from others because of our history and reputation.  A recent consumer product recall and FDA warning letter were important reminders of this expectation and the vigilance it requires." <u>Id.</u> at ¶ 178.[9]  Plaintiff alleges that this statement, and the January 26, 2010 press release, both fail to disclose that J&J and McNeil executives approved the Motrin phantom recall during

---

[8]     It is not clear from the Amended Complaint why Plaintiff attributes the press release to Weldon, however, the Court assumes for the sake of argument that Weldon made this statement.

[9]     Plaintiff's do not allege the date of this call, but assert that it was "[i]n connection with the Fourth Quarter and Full-Year 2009 earnings release ...."  <u>Id.</u> Because the only FDA warning letter referenced in the Amended Complaint is dated January 15, 2010, it appears that the conference call must have taken place after that date.

2009.  Id. at ¶¶ 177-80.  Plaintiff further alleges that this statement created the misleading impression that the recalls referenced in the FDA letter were isolated incidents and that J&J was taking steps toward ensuring product safety.  Id. at ¶ 180.

As an initial matter, Plaintiff's allegation of omission cannot stand because there are no particularized facts in the Amended Complaint suggesting, much less creating, the strong inference that Weldon knew about the phantom recall at the time he made the conference call statement or when the January 26, 2010 press release was issued. Moreover, Plaintiff points to nothing in Weldon's congressional hearing testimony that suggests he was aware of the phantom recall in January.  Indeed, the only allegations that speak to his knowledge or conscious disregard of the phantom recall are conclusory.  See e.g., Am.Compl., ¶ 247 ("Weldon . . . knew or consciously and recklessly disregarded that the phantom recalls and other material facts were misrepresented in, or omitted from, the Company's public statements.")  Thus, Plaintiff's omission allegations do not present clear facts verifying Plaintiff's deductions about Weldon's state of mind when he made the statement.  See Burlington, 114 F.3d at 1422 (citation omitted).

As for the purported misstatements in the conference call and press release, Plaintiff has not alleged with particularity that Weldon made those statements knowing that he was "misrepresenting material facts related to the corporation."[10]

---

[10]    To be clear, the Court does not rule upon whether any of the alleged statements are misrepresentations or omissions; this Opinion focuses solely on whether Plaintiff has sufficiently pled scienter.

Campbell Soup,145 F. Supp. 2d at 599 (quotations omitted).  Nor has Plaintiff alleged with particularity that Weldon <u>recklessly</u> made those statements by disregarding a substantial risk that the statements were false.  Indeed, Weldon's statement in the press release that J&J maintained a "long-term focus" is vague, and Plaintiff's allegations do not link that statement to the quality control issues at the McNeil Puerto Rico plant.  Moreover, while Plaintiff alleges, in a conclusory fashion, that Weldon knew that McNeil sacrificed J&J's quality image for short-term profits, Plaintiff has not asserted any particularized facts to support that conclusion.  As for the conference call statement, quoted <u>supra</u>, nothing in that statement intimates that Weldon knew about, or recklessly disregarded, McNeil's quality control problems prior to the FDA warning letter.

In addition, while Plaintiff makes much of Weldon's statement before the congressional committee that "there were adverse events reported that we knew," Am.Compl., ¶ 264, it is clear from the context of his statement that he was referring to the consumer complaints received in 2008 about the musty odor in certain Tylenol and other OTC products.  Thus, Weldon's statement is relevant only to the Tylenol OTC recalls—not the Motrin phantom recall.  Moreover, while Weldon stated in his testimony that the phantom recall was a "mistake," and that McNeil "should have notified [the FDA] that we would be taking [the] products . . . off the shelves," <u>id.</u> at ¶

246, he did not testify that he knew about the phantom recall at the time of the January 26, 2010 press release statement or the conference call.[11]

Plaintiff, further, alleges that the magnitude of Weldon's incentive-based compensation during the Class Period is "probative" of his state of mind. Id. at ¶¶ 247-48. In making this allegation, Plaintiff appears to challenge Weldon's motives. However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice" as particularized allegations of scienter. Intelligroup, 527 F.Supp.2d at 284; ( citing GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004)). See also Nat'l Junior Baseball, 720 F.Supp.2d at 552. Moreover, courts have specifically held that incentive compensation is not a colorable basis upon which an allegation of fraud can be predicated. Nat'l Junior Baseball, 720 F.Supp.2d at 552 (quoting Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir. 1994)).[12]

---

[11]   Even if his statements could be read to suggest that Weldon knew about the phantom recall prior to the January 26, 2010 press release, that conclusion would not alter my holding because, as explained herein, Weldon was under no duty to disclose the phantom recall.

[12]   Relatedly, Defendants point out that Weldon (as well as Caruso and Goggins) all increased their holdings of stock during the Class Period, which raises a compelling inference against scienter under Third Circuit law. See Globis, 241 Fed App'x at 832. In support of this argument, Defendants attach documents evincing Weldon's stock purchases. The Court may consider such documents because they are publically-filed SEC documents. See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (holding that district court may rely on "documents filed with the SEC, but not relied upon in the Complaint"); Intelligroup, 468 F.Supp.2d at 678-79. Moreover, the Court agrees that these documents raise an inference against scienter.

Additionally, Plaintiff makes the generalized allegation that Weldon either knew or "consciously disregarded" the phantom recall and the quality control problems at McNeil, and that he failed to disclose these problems in J&J's public statements.[13] Am.Compl., ¶ 247.  Even assuming that Weldon had full knowledge of both the recall of the musty-smelling OTC products and the phantom recall, Plaintiff has not sufficiently alleged that he was a under a duty to disclose those facts.  Under Third Circuit case law, there are only three instances when a corporate officer is under an affirmative duty to disclose—"when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."  Oran, 226 F.3d at 285-86.  Where no such duty exists, an officer's "[s]ilence . . . is not misleading under Rule 10b-5."  Id. at 285 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).[14]

---

[13]     Plaintiff also alleges that Weldon refused to appear at the May 2010 Congressional hearing on the J&J recalls, and that this failure "is further probative of his conscious and reckless disregard of the material omissions that severely impacted [J&J]."  Am.Compl., ¶ 246.  This conclusory allegation, which provides no factual basis for asserting why Weldon did not appear at the May hearing, does not constitute a fact from which Weldon's state of mind may be inferred.  Moreover, Weldon testified at the September 30, 2010 Congressional hearing that he was unable to attend the May hearing because of back surgery.  See September Cong. Hrg. at 7.  The Amended Complaint even acknowledges that he made this excuse.  See Am.Compl., ¶ 94.

[14]     As explained below, an officer may make statements affirmatively characterizing a management practice that require the officer to speak truthfully about the matters addressed.  See Shapiro v. UJB Financial Corp., 964 F.2d 272 (3d Cir. 1992).  That doctrine is discussed in connection with my analysis of Defendant Caruso.

The Amended Complaint does not allege that Weldon engaged in insider trading, and, although Plaintiff points to 17 C.F.R. 229.303 ("S-K 303") as a regulation mandating disclosure, in <u>Oran</u>, the Third Circuit has explicitly rejected the argument that SK-303 creates a duty of disclosure that would constitute a material omission under Rule 10b-5. <u>See</u> <u>Oran</u>, 226 F.3d at 288.[15]  Furthermore, Plaintiff has not alleged that Weldon made an inaccurate, incomplete or misleading prior disclosure that he was obligated to correct or supplement.  Accordingly, I conclude that Weldon was under no duty to disclose either the Tylenol OTC recall or the phantom recall.

In terms of recklessness, the Amended Complaint appears to further allege that Weldon did not fully apprise himself of how J&J's cost-cutting initiatives might affect the quality of the medicines McNeil produced, and that he unduly focused on McNeil's

_____

[15]    Plaintiff attempts to distinguish the Third Circuit's decision in <u>Oran</u>, arguing that <u>Oran</u>'s holding applies only to allegations that fail to satisfy the general test for securities fraud materiality set forth by the Supreme Court's decision in <u>Basic</u>. <u>See</u> Pl. Opp. at 39 n.7.  I disagree.  In reaching its holding, <u>Oran</u> reasons: "demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5. <u>Such a duty to disclose must be separately shown.</u>"  226 F.3d at 288 (emphasis added) (quoting <u>Alfus v. Pyramid Tech. Corp.</u>, 764 F.Supp. 598, 608 (N.D.Cal. 1991)).  <u>Accord</u> <u>In re Marsh & Mclennan Companies, Inc. Securities Litig.</u>, 501 F.Supp.2d 452, 473 (S.D.N.Y. 2006) (relying on <u>Oran</u> for the proposition that "even if the Complaint's allegations were sufficient to establish a violation of [S-K 303], the violation alone would be insufficient to establish Defendants' liability under Section 10(b) and Rule 10b-5.").  <u>See</u> <u>S.E.C. v. Conaway</u>, 698 F.Supp.2d 771, 835 n.52 (E.D.Mich. 2010) (collecting cases).

Plaintiff further argues that the Second Circuit recently held in <u>Litwin v. Blackstone Group, L.P.</u>, 634 F.3d 706 (2d Cir. 2011), that S-K 303 can give rise to liability under the securities laws.  As Defendants point out, however, that decision does not address Rule 10b-5 violations and is, accordingly, not applicable here.

28

short-term profitability rather than paying attention to signs that McNeil's quality assurance problems were getting out of control.   As noted, a plaintiff may allege scienter either by asserting that a defendant knew a statement was false, or by asserting that the defendant was "reckless in disregarding a substantial risk that it was false." Makor, 513 F.3d at 704.

In his opposition brief, Plaintiff argues that he has pled allegations of "red flags" that Weldon ignored.  Indeed, cases have entertained such "red flag" theories where the allegations set forth " specific facts to show that defendants knew or could have known about the . . .  errors, "or that their regular procedures should have alerted them to the errors sooner than they did." In re Comshare, Inc. Securities Litig., 183 F.3d 542, 553 (6th Cir. 1999) cited in Intelligroup, 527 F.Supp.2d at 286-87.[16]  Courts have also found sufficient allegations that a defendant was actually advised of, but ignored, "red flags."  See e.g., In re Health Mgmt. Inc. Sec. Litig., 970 F.Supp. 192 (E.D.N.Y.1997).

The key for successfully pleading a "red flag" theory is asserting specific facts from which a particular defendant's recklessness can be inferred. Here, Plaintiff generally alleges widespread quality control failures at J&J and the several OTC medicine recalls.  See Am.Compl., ¶¶ 63, 105, 175, 217.  Plaintiff further alleges that

---

[16]     Defendant challenges Plaintiff's citation to Shogen v. Global Aggressive Growth Fund, Ltd., No. 04-5695, 2007 WL 1237829 at *12 (2007), for the proposition that a plaintiff may utilize "red flag" allegations to assert recklessness. Whether or not Shogan stands for this proposition, there are several cases within this district that do so.  See e.g., Nat'l Jr. Baseball, 720 F.Supp.2d at 557; Intelligroup, 527 F.Supp.2d at 286-87.

the FDA deemed these failures a "systemic problem." Id. at ¶¶ 189, 212. Relatedly, Plaintiff alleges that the OTC medicines, particularly the J&J flagship brands of Tylenol, Motrin, and Benadryl, were part of J&J's core business. See id at ¶ 30. According to Plaintiff, the OTC medicines were part of the profitable consumer healthcare segment of J&J, which segment accounted for at least 25% of J&J's total revenues. See id. at ¶¶ 29, 69. Plaintiff claims that Weldon acknowledged as much by stating that "[w]e are very conscious of the bar we set for ourselves and that consumers expect more from us than from others because of our history and reputation." Id. at ¶ 178.

Notably, these allegations do not specify which red flags Weldon knew. Of course, elsewhere in the Amended Complaint, Plaintiff alleges that Weldon received the January 15, 2010 FDA warning letter. But, even if the warning letter placed him on notice of the nature of McNeil's quality control problems, Plaintiff have not sufficiently alleged that he was under a duty to disclose the contents of the FDA warning letter, or the phantom recall. In this connection, it is also important to note that Weldon is the CEO of J&J, the parent company of McNeil; he is not an officer of McNeil. For this reason, even though Plaintiff characterizes Tylenol, Motrin, and Benadryl as flagship products, the Amended Complaint acknowledges that the consumer healthcare division as a whole makes up less than one-third of J&J's sales.[17]

---

[17]    In this way, Plaintiff's allegations differ from those in Makor, where the Seventh Circuit held that the CEO of a company that sold two key products must have known that statements he made about those products were false. See 513 F.3d at 711.

In this regard, cases have held that "[f]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]," id. (quoting In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 554 (6th Cir. 1999), and courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on it subsidiary's internal controls," id. (quoting Advanta, 180 F.3d at 540).   Indeed, "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary ... as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." Alpharma, 372 F.3d at 151 (quoting Kushner v. Beverly Enterpr., 317 F.3d 820, 829 (8th Cir. 2003)).   In short, "[a]llegations akin to corporate mismanagement are not sufficient." City of Roseville, 2011 WL 3695897 at *2.   Therefore, Plaintiff's "red flag" allegations do not sufficiently allege scienter against J&J's CEO Weldon.

Finally, Plaintiff argues that "Defendants'" role in approving practices that contributed to McNeil's quality assurance problems is further evidence that they were aware of the problems at McNeil.  Pl. Opp. at 26.  In support of this argument, Plaintiff points to allegations in the Amended Complaint that J&J transferred quality control for OTC medicines from the pharmaceutical segment to the consumer healthcare segment, and that Defendant denied or delayed requests for additional resources and/or equipment to address quality control failures.  See Am.Compl., ¶¶ 2, 36, 46-61. However, none of these allegations specifically address Weldon's role in approving any of the practices that allegedly led to McNeil's demise and, therefore, they are not probative of his scienter, nor that of any other individual defendant.

31

Considering the totality of all of the allegations against Weldon in the Amended Complaint, and all documents referenced therein, I find that Plaintiff has not alleged particularized facts that give rise to a strong inference of scienter. However, it is possible that Plaintiff may amend his pleading to include more particularized facts that will meet the PSLRA's heightened pleading standard. Therefore, Plaintiff's claim against Weldon is dismissed without prejudice and Plaintiff is granted leave to file a Second Amended Complaint in accordance with the dictates of this Opinion.

### B.   Defendant Luther

Plaintiff makes several scienter allegations about Defendant Luther, the President of McNeil. I first address Plaintiff's allegations as to what facts Luther knew, and then turn to his alleged misrepresentations and omissions.

As for the phantom recall, Plaintiff alleges that Luther knew about the phantom recall, based on his receipt of an email communication in May 2009, and as demonstrated by the alleged internal J&J memo in which he directed McNeil employees to "make [the recall] happen ASAP." Am.Compl. at ¶ 69. To be clear, Plaintiff alleges that Luther's full statement was: "Given our current financial situation, I hope we're not going to double our costs to do this. Let's make this happen ASAP." Id.

In addition, Plaintiff alleges that Luther knew about McNeil's systemic quality control problems, at both the Fort Washington and Puerto Rico plants, because Luther received a copy of the January 15, 2010 FDA warning letter, id. at ¶ 11, and was present at the February 19, 2010 FDA meeting with senior McNeil and J&J executives,

32

id. at ¶ 6.  See also id. at ¶¶ 268-69.  As noted, FDA compliance officials discussed J&J's apparent lax culture of compliance at that meeting.  Further, Plaintiff alleges, Luther knew that J&J's and McNeil's aggressive cost cutting was the source of McNeil's quality control difficulties.  Id. at ¶ 269.

In support of the assertion that Luther knew that the cost-cutting measures caused McNeil's quality control problems, Plaintiff alleges that a confidential witness, CW1, attended a "Town Hall Meeting," in 2007 or 2008, at which a "brave" floor plant worker questioned Luther about the company's cost-cutting measures, and Luther responded that the cost-cutting measures were company wide.  Id. at ¶ 53. Additionally, Plaintiff alleges that the same confidential witness describes Luther as the one who repeatedly denied his quality control employees' requests for funding for necessary improvements at the Fort Washington plant.  Id. at ¶ 54.  Aside from these specific allegations, Plaintiff generally asserts that Luther knew about the effects of J&J's cost-cutting measures due to his position as the President of McNeil.  Id. at ¶ 269.

In my view, Plaintiff alleges with particularity that Luther knew about the phantom recall.  That he directed subordinates to ensure that the recall was cost-efficient sufficiently alleges his knowledge.  Accord Steiner v. MedQuist, Inc., No. 04-5487, 2006 WL 2827740 at * 18 (D.N.J. Sept. 29, 2006) (holding that officer who allegedly directed employee to falsify bills had knowledge of fraudulent billing scheme). While Defendants argue that his directive merely suggests that he instructed the employees to retrieve the products quickly, and that no untoward motive should be

33

drawn from his statement, in light of the other allegations in the Amended Complaint that suggest McNeil intentionally failed to disclose the phantom recall to the FDA, Plaintiff's interpretation of Luther's email is just as compelling as Defendants' proposed interpretation. See Tellabs, supra at 2504-05 (A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

With respect to his knowledge of the quality control problems at the McNeil plants, the Amended Complaint alleges that Luther received a Form 483 report from the FDA on  June 4, 2009.  Am.Compl., ¶ 267.  That report highlighted several deficiencies at the Fort Washington plant, including rusty and leaky metal beams located above the "Dry Granulation/Dry Blend" area. Id.  In addition, the FDA's form noted that McNeil's quality assurance department had failed to "reject any lot of components that did not meet the appropriate written specifications for identity, strength, quality, and purity." Id.  Furthermore, the FDA indicated that procedures for handling "all written and oral complaints regarding a drug product are not followed."  As an example, the FDA recounted an incident where complaints received about Children's Tylenol products were classified "Adverse Events" before McNeil conducted a complete investigation.  Moreover, the FDA stated that McNeil did not perform batch quality reviews or trend analyses in investigating those complaints. Id. Additionally, as noted supra, Plaintiff alleges that Luther received the January 15, 2010 FDA warning letter and attended the February 19, 2010 FDA meeting that addressed

McNeil's quality control problems.  These FDA documents and the meeting sufficiently allege that Luther was aware of McNeil's systemic quality control problems.

As for Plaintiff's allegations that CW1 heard Luther respond that cost-cutting measures were employed throughout J&J, and that Luther repeatedly denied requests for capital improvements at the Fort Washington plant, these assertions do not sufficiently allege pre-FDA warning letter knowledge of the quality control problems, or that cost-cutting led to those problems.  Assuming for the sake of argument that CW1's assertions should be taken as true for purposes of this motion,[18] that Luther was aware of J&J's cost-cutting initiatives does not suggest that he was also aware of the effect of those initiatives.  Moreover, that Luther denied capital improvement requests also does not suggest that he was aware of the effect of that decision on his employees' ability to perform their quality assurance duties.  Therefore, this allegation, on its own, is not sufficient to allege that Luther knew that J&J's cost-cutting strategies were inhibiting McNeil's quality assurance efforts.  Nevertheless, considering the Plaintiff's allegations as a whole, Plaintiff has sufficiently alleged Luther's knowledge of the phantom recall and McNeil's more systemic quality control problems.

---

[18]     As noted, when evaluating a complaint that is based upon the statements of confidential witnesses, courts "consider the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Nat'l Jr. Baseball, 720 F.Supp.2d at 557 (quoting Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 148 (3d Cir. 2004)).

The more difficult question is whether Plaintiff has sufficiently alleged that Luther possessed the requisite scienter when he allegedly misrepresented the facts he knew and failed to disclose both the phantom recall and McNeil's general quality control deficiencies.  Plaintiff alleges that "[t]hrough J&J's and McNeil's press releases, Luther provided materially false and misleading information regarding [J&J's] systemic quality control deficiencies and actions taken to redress the same."  Id. at ¶ 267.   The Amended Complaint further alleges that Luther lied to the FDA investigators at the Fort Washington plant, telling them that the plant did not manufacture medicines for other companies, only to have a competitor publically announce four days later that their PediaCare children's medicines were made at the same plant.  Id. at ¶¶ 99, 221 (quoting June 11, 2010 Pharmalot.com website).  Further, the Amended Complaint alleges that Luther failed to disclose the phantom recall in SEC public filings and other public statements.  Id. at ¶ 272.  According to the Amended Complaint, Luther was responsible for the content of the SEC filings and public statements because he reported directly to Marc Robinson, J&J's Group Chairman of Consumer Healthcare, who reported directly to Defendant Goggins.  Id.

As an initial matter, Plaintiff's press release allegations do not satisfy Rule 9(b), or the PSLRA heightened pleading standard, because they do not specify, with particularity, the date of the press releases or the precise statements attributable to Luther and why those statements are misleading.  See Advanta, 180 F.3d at 534 (stating that rule 9(b) "requires plaintiffs to plead the who, what, when, where  and how: the first paragraph of any newspaper story.") (internal quotation marks omitted);

36

Shapiro v. UJB Financial Corp., 964 F.2d 272, 284 (3d Cir. 1992) ("Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact ...."). The Amended Complaint makes the general assertion that Luther was responsible for press releases, but even assuming that portions of the press release are attributable to him, the Amended Complaint fails to link Luther to any particular press release statements and explain why those statements are misleading. Cf. Winer Family Trust v. Queen, 503 F.3d 319 (3d Cir. 2007) ("Winer failed to adequately plead scienter by failing to link the declarant of the challenged statement with facts that might contradict his statement.") This same analysis holds true for the SEC filings and public statements; Plaintiffs do not allege with particularity which misstatements Luther incorporated into particular filings and public statements, and how those misstatements relate to the facts Luther knew. Compare In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig., No. 05–1151, 2011 WL 3444199 at *23 (Aug. 8, 2011) (addressing particular statements found within 10-Ks signed by defendant). Plaintiff's allegation that Luther reported directly to J&J's Group Chairman of Consumer Healthcare, who reported directly to Defendant Goggins, does not explain why the press releases, SEC filing, or any public statements are generally attributable to him or what portions of those documents he authored or directed for inclusion.

By merely citing to documents and generally attributing them to Luther, Plaintiff runs afoul of the group pleading doctrine repudiated in Winer. See 503 F.3d at 337. Previously, under that doctrine, a plaintiff could simply allege that a statement was attributable to "to officers and directors who have day-to-day control or

involvement in regular company operations." Id. at 335. Winer, however, held that the group pleading doctrine is not compatible with the PSLRA's heightened pleading standard. The plaintiff in Winer did not connect several of the corporate defendants in that case to a press release issued by the company, and the Winer court upheld the district court's dismissal of securities fraud claims against those defendants. However, the court left in claims against another defendant whom the plaintiff alleged was quoted in the company's press releases. According to the court, the quoted statements were "directly attributed" to that defendant and, therefore, did not violate the group pleading doctrine. Id.[19]

Plaintiffs, further, allege that Luther omitted the phantom recall and McNeil's pervasive quality control problems from McNeil press releases and from McNeil's SEC statements and public filings. As explained above, however, a corporate officer does not commit securities fraud by omitting information unless he is under a duty to disclose that information. See United States v. Schiff, 602 F.3d 152, 163 (3d Cir. 2010). An affirmative duty to disclose arises only when one of Oran's three prongs is

---

[19]     On a related point, Defendants argue that Plaintiff's allegations are inconsistent with the Supreme Court's recent decision in Janus Cap. Group, Inc. v. First Derivative Traders, 524 U.S. —, 131 S.Ct. 2296, (June 13, 2011), where the Court held that a company statement may not be attributed to a corporate officer unless that officer has "ultimate control over the statement and it is attributed to him." Def. Reply at 7. This general proposition is true, see Janus, 131 S.Ct. at 2302, although the facts of Janus are distinguishable from this case. As explained by a recent district court decision in this district, Janus involved a plaintiff's attempt to attribute statements issued by one corporation to the officer of a separate, but related, corporation. Merck, 2011 WL 3444199 at *24-25. Here, in contrast, Plaintiff does not appear to be attributing the statement of McNeil to J&J's officers or vice versa.

triggered: (1) insider trading; (2) a statute requiring disclosure; or (3) an inaccurate, incomplete, or misleading prior disclosure.  Id. at 162 (quoting Oran, 226 F.3d at 285).

Plaintiff has not alleged that Luther engaged in insider trading, that he was under a statutory obligation to disclose, or that he previously made an inaccurate, incomplete, or misleading disclosure that needed to be corrected or updated.  The only alleged misrepresentation that could potentially fall within this latter category is Luther's alleged lie to the FDA that the Fort Washington plant did not manufacture medicines for other companies.  That statement, however, was not directed at shareholders but at the FDA and, more importantly, it has nothing to do with the McNeil product recalls that form the basis of Plaintiff's claims.

Plaintiff further argues that the Amended Complaint alleges facts akin to the sufficiently pled allegations of In re Able Laboratories Securities Litig., No. 05-2681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008).  The complaint in Able addressed allegations of recklessness against Dhananjay G. Wadekar, the CEO of the drug company Able Laboratories ("Able").  The complaint, in that case, alleged that the Wadekar received notice of several FDA warning letters, as well as a Form 483 inspection report detailing numerous deficiencies at Able's drug manufacturing facilities. Ultimately, Wadekar and the other corporate officers failed to comply with the FDA's directives in its warning letters, one of which explicitly told Wadekar that "[t]he specific violations noted in this letter are serious and may be symptomatic of serious underlying problems. You are responsible for investigating and determining the causes of the violations identified above and preventing recurrence of similar violations."  Id. at *2

(emphasis added).  Thereafter, Able initiated a nationwide recall of a key drug.  Id. at *7.

Importantly, the complaint in Able alleged with particularity that Wadekar made several misrepresentations to shareholders about Able's manufacturing deficiencies.  For one, he misrepresented that a consent decree between Able and the FDA was resolved.  Id. at *3.  In addition, he stated at a healthcare conference that "[o]ur facility is fully compliant with the current good manufacturing practices," when the company was not.  Id.  Thereafter, Wadekar added to an Able press release that "[o]ur fundamentals and pipeline continue to be strong ...."  Id. at *4.  Further, Wadekar remarked on an investor conference call that the recall of Able's key drug "was fairly contained and . . . would have no impact on the second quarter."  Id. at *8.  Each of these alleged statements was linked specifically to Wadekar, and the date of each of these alleged statements was also set forth in the plaintiff's allegations.  In light of the alleged misrepresentations, and Wadekar's knowledge that Able was facing serious manufacturing problems, the Able court concluded that these allegations sufficiently alleged that Wadekar recklessly made misstatements about the company. Id. at *15-17.

Here, by contrast and as explained above, the Amended Complaint does not include specific misstatements attributable to Luther that contradict facts he knew or consciously disregarded.  Also unlike Able, Plaintiff's allegations here do not reference any misrepresentations that Luther recklessly made about the status of McNeil's quality control program.  Morever, there are no particularized allegations that Luther

failed to address the concerns highlighted in the June 4, 2009 FDA Form 483 inspection report or the January 15, 2010 FDA warning letter.  Thus, <u>Able</u> is factually distinguishable.[20]

Considering all the facts relating to Luther in the Amended Complaint, while Luther's knowledge of the phantom recalls and McNeil's quality assurance deficiencies is sufficiently pled, Plaintiff has not sufficiently alleged that Luther either made a statement he knew was false or that he made a statement recklessly disregarding a substantial risk that it was false.  Nor has Plaintiff sufficiently alleged that Luther was under a duty to disclose what he knew.  Accordingly, for the foregoing reasons, I conclude that Plaintiff has not sufficiently alleged scienter, and the claims against Defendant Luther are hereby dismissed without prejudice.  Plaintiff is granted leave to file a Second Amended Complaint consistent with this Opinion, if Plaintiff can attribute specific statements to Luther.

### C.    Defendant Goggins

The Amended Complaint paints a picture of Goggins as an inept chairman of the consumer products division at J&J, who imposed "mind-boggling, unheard-of" cost-cutting goals for the sake of increasing McNeil's bottom line, and sacrificing

---

[20]    Plaintiff argues that his allegations mirror those in <u>Able</u> because he alleges that Defendants initially failed to disclose the phantom recall to the FDA, <u>see</u> Am.Compl., ¶¶ 63-64, 72, and because the FDA also issued a Form 483 letter detailing inspection violations, <u>id.</u> at ¶ 174-75, 212.  Despite the Amended Complaint's inclusion of these allegations, <u>Able</u> is nonetheless factually distinguishable because Plaintiff's allegations here do not address Luther's post-FDA warning letter response but focus primarily on the phantom recall, which took place before the warning letter was issued.

quality OTC products to meet that goal.  See Am.Compl., at ¶ 45.  For example, the Amended Complaint alleges that Goggins denied funding for essential capital improvements.  Id. at ¶ 141.  Plaintiff alleges that, by making these sort of decisions, Goggins consciously and recklessly disregarded known deficiencies.

The Amended Complaint further alleges that Goggins made several misstatements and omissions.  In general terms, Plaintiff alleges that "Goggins reported to analysts, investors and consumers that J&J's cost-containment efforts were not having any adverse impact on J&J's operations," without pointing to any specific statement made by Defendant Goggins to this effect.  Id. at ¶ 47.  Plaintiff additionally alleges that on March 30, 2008, Goggins touted J&J's acquisition of Pfizer Consumer Healthcare, stating that with the acquisition "It's our intention to build a premier consumer healthcare company as part of Johnson & Johnson's broadly based strategy." Id. at ¶ 118.  In a June 5, 2008 conference call with investors and analysts, she also described the acquisition as positive, stating that J&J's "global medicine cabinet is expanding." Id. at ¶ 119.[21]  She allegedly failed to disclose, in that conference call, that J&J was transferring the quality control oversight functions from the company's pharmaceutical division to its consumer product division.  Id. at ¶ 124.

With respect to Defendant Goggins' knowledge of the phantom recall, Plaintiff's allegations center on her testimony at the May and September 2010 Congressional hearings.  At the hearing, Goggins_responded to Congressman Town's question

---

[21]    The Amended Complaint includes similar, additional allegations too lengthy to repeat here.  See id. at ¶¶ 120-123.

whether McNeil or J&J hired a third-party contractor to go into stores and buy the Motrin rather than recalling it by stating "No, we didn't . . . I know nothing about that, sir." Id. at ¶ 98. According to the Amended Complaint, while Goggins claimed that she was not aware of the phantom recall until advised by the congressional committee, she must have known about the recall because Luther, her subordinate, knew of that fact. Further, her position as the head of J&J's consumer products division mandates such a conclusion. Am.Compl., ¶ 12, 26. Plaintiff additionally alleges that Goggins knew about the phantom recall because she attended the February 19, 2010 FDA meeting at which the FDA's concerns about the phantom recall were discussed, id. at ¶ 216, along with the FDA's general concerns about McNeil's systemic quality control failures. Id. at ¶¶ 6; 259.[22] In addition, Plaintiff alleges that, at the May hearing, Goggins denied reducing the number of quality control employees at McNeil, yet CW1 asserts that Goggins refused to employ additional staff to help "tackle the additional load at McNeil," id. at ¶ 51, and Plaintiff generally alleges that Goggins otherwise directed the reduction of quality control personnel, id. at ¶ 216.

With respect to the quality control failures at the Fort Washington plant, Plaintiff alleges that Goggins admitted to Congress that she was aware of the quality control problems at that plant since the first half of 2009. Id. at ¶¶ 196; 255. This allegation, however, does not point to any particular statement in the May or September hearing transcripts. Nonetheless, in Plaintiff's view, Goggins' admission

---

[22]    While Defendants contest that Goggins was present at the February 19, 2010 meeting, the Court must take this allegation as true on a motion to dismiss.

contradicts the tenor of a May 4, 2010 McNeil press release announcing the closing of the Fort Washington plant, which failed to acknowledge the long history of problems. Id. at ¶ 195.  That press release did acknowledge the FDA's observations at the plant and states that "[e]arly [in 2010] we initiated a comprehensive assessment of quality and manufacturing systems across our operations [and w]e have committed extensive internal resources to this effort ...."  Id.  Plaintiffs appear to argue that the press release was misleading because it did not indicate that McNeil's quality assurance problems pre-dated 2010.  The Amended Complaint, however, does not allege that the press release is attributable to Goggins.  Id.

As for quality control at McNeil generally, the Amended Complaint generally alleges that "it is impossible to imagine that J&J's Consumer Group leader, who also was a member of the Company's Executive Committee, can plausibly claim that he [sic] was unaware of the dire situation arising from the Company's lax quality control." Id. at ¶ 257.  Lastly, as with the allegations against Weldon, Plaintiff alleges that Goggins stood to receive bonuses and additional compensation if she met certain sales goals. The Amended Complaint, further, alleges that Goggins resigned on September 16, 2011, stating that she was retiring.  According to Plaintiff, the "suspicious timing" of her departure from J&J is further evidence of scienter.  Id. at ¶ 265.

While Plaintiff asserts a host of allegations against Goggins, many of the allegations do not sufficiently allege scienter.  For one, allegations that Goggins' subordinates knew of the phantom recall are insufficient.  See In re Alpharma Inc. Securities Litig., 372 F.3d 137, 150-51 (3d Cir. 2004).  Moreover, many of Plaintiff's

allegations are that Goggins should have known about McNeil's quality control problems by virtue of her position.  These sort of allegations have been rejected by courts; it can not be presumed that a corporate officer has knowledge of the day-to-day operations of each plant under her supervision, there must be some additional "special circumstance which, taken together with an officer's position, support a strong inference of scienter." See Avaya, 564 F.3d at 271 (quoting Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 342 (5th Cir. 2008)).  See also Nat'l Jr. Baseball, supra at 38-39.  In addition, many of Plaintiff's allegations do not point to any specific misstatement or omission made personally by Goggins.  As noted in my analysis of Plaintiff's claims against Luther, the PSLRA and Rule 9(b) standards require greater specificity.

As for Plaintiff's allegation that, at the May hearing, Goggins denied reducing the number of quality control employees at McNeil, the only fact alleged in support of that assertion is that CW1 states that Goggins reduced the number of quality control staff.  As explained above, when evaluating a complaint that is based upon the statements of confidential witnesses, courts "consider the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Avaya, 564 F.3d at 253 (quoting Chubb at 148).  Here, there is no corroboration of the confidential witness's statement that Goggins reduced quality assurance staff at McNeil, nor are there any additional facts that demonstrate the plausibility of this allegation.  Hence I do not credit the confidential witness assertion and, therefore, do not find that Plaintiff has

sufficiently alleged scienter with respect to Goggins' statement about the number of employees retained.

That said, Plaintiff's assertion that Goggins attended the February 19, 2010 meeting where the phantom recall was discussed sufficiently alleges that she had knowledge of the recall when she testified at the May Congressional Hearing that she did not have such knowledge. Defendant questions whether this statement constitutes the sort of public statement that is actionable under the securities law; it was not a statement made to investors, but to the congressional committee. Neither party provided the Court with authority on this question, and this Court's research has not revealed any cases addressing the issue. In my view, while the statement was not directed at investors, it was nonetheless a public hearing, reported to the public, and it was under oath. In this way, a congressional hearing that is reported publically is similar to media statements or press releases, which courts have analyzed under Rule 10b-5. See e.g., Furst v. Feinberg, 54 Fed.Appx. 94, 97 (3d Cir. 2002).

Defendant further argues that Goggins did not unequivocally state that she was unaware of the phantom recall. Rather, according to Defendants, she clarified at the May hearing that "I can't tell you about the behavior of these contractors in the market or what they said or what they didn't say or how they acted." Def. Open. Br. at 27 (citing May Cong. Hrg. at 87-88).[23] But this statement does not expressly disavow her

---

[23]   Defendants also point to Goggins' testimony at the September Congressional Hearing that she did not know about the instructions given to the contractors. See Def. Open. Br. at 27. But taking as true Plaintiff's allegation that she was present at the February 19, 2010 meeting, this testimony actually suggests that

alleged prior statement that J&J did not "have contractors go back to stores and buy medicine instead of recalling the medicine ..."  Am.Compl., ¶ 144. A plausible interpretation of two statements is that the Goggins attempted to qualify her "No, we didn't" statement, which referred to whether <u>J&J</u> or <u>McNeil</u> directed contractors to perform the recall, with the follow-up statement that she did not know what the <u>contractors</u> did.  What J&J or McNeil directed and what the contractors did may very well have been two different things.  Thus, in my view, Plaintiff's allegations that Goggins acted with scienter by testifying that she did not know about the phantom recall when she in fact did is just as plausible of an inference as the one Defendants put forth.

Considering these allegations, along with the other allegations specific to Goggins that are pled in the Amended Complaint, I conclude that Plaintiff has alleged facts from which a compelling inference of Goggins' scienter can be drawn.

### D.  Defendant Caruso

For Defendant Caruso, J&J's Chief Financial Officer, Plaintiff asserts that he participated in several investor and analyst conference calls in which he misrepresented the nature of J&J's cost-cutting initiatives and the resulting effect on quality control at McNeil.  For example, in paragraph 158 of the Amended Complaint, Plaintiff recounts a conference call that reported the financials for the second fiscal quarter of 2009.  Plaintiff does not specify the date of the call, but quotes some of

---

Goggins was not truthful about her knowledge of the phantom recall.

Caruso's comments which include: "I think our people did an excellent job in managing the business, quite frankly, and keeping a rein on cost and being judicious about where we could make investments and where we can otherwise operate more efficiently." According to Plaintiff, these sorts of statements are misleading because J&J was not being judicious about cutting costs, but was recklessly cutting costs and sacrificing quality control.  Plaintiff also alleges that, in that same conference call, Caruso falsely represented to shareholders and the public that J&J was "making prudent investments that will grow our business for the long term."  Id.  Further, Plaintiff alleges, Caruso stated in that conference call that ""[a]s I have said many times before, the people of Johnson & Johnson always manage the business very well."  Id. at ¶ 161.  Caruso's failure to inform the public of the systemic nature of McNeil's quality control problems makes this statement misleading, according to Plaintiff.  Id.

In addition, Plaintiff alleges that Caruso "recklessly assured investors during a May 11, 2010 investor conference that the Company's control deficiencies were limited to the Fort Washington plant, characterizing the FDA's crackdown on Fort Washington as an isolated occurrence."  Id. at ¶ 11.  Caruso's alleged statement was made as part of the following colloquy:

> [Analyst]: In terms of providing a level of confidence that this is a McNeil-specific issue, what could you say to that in terms of giving people comfort that in the larger pharmaceutical business, you are comfortable with the quality systems that you have today and comfortable with your positioning? . . .
>
> [Caruso]: Well, one thing to keep in mind is this is a very specific inspection of one manufacturing plant in our

48

consumer business. *The comments by the FDA are very specific to that particular facility.* And the other thing to point out is that we have many manufacturing facilities around the world that are consistently inspected, both internally and by outside regulatory agencies, throughout the year, and those are individually addressed by the management teams at those businesses. And this particular instance and this particular recall is reflective of the conditions at the McNeil Fort Washington facility."

Id. at ¶ 199 (quoting May 11, 2010 conference call) (emphasis in original).  Plaintiff asserts that this statement was false and misleading, and omitted material information, because the FDA warning letter issued on January 15, 2010, also addressed deficiencies at the Puerto Rico plant.  Id.  Moreover, Plaintiff points to the February 19, 2010 meeting as a source of Caruso's knowledge, and the May Congressional hearing which took place on May 27, 2010.  Id.

Relatedly, Plaintiff alleges that Caruso misrepresented in an April 20, 2010 conference call that the "OTC recall has not really impacted either physician recommendations or consumer preferences."  Id. at ¶ 184.  Plaintiff alleges that this conference call was misleading because "in the context of discussing the Company's purported voluntary recalls and other steps taken to address product quality concerns, he consciously and recklessly omitted material information regarding the twenty-month delay of the 'moldy' Tylenol recall in 2008 and 2009, and the phantom recall of Motrin conducted in early 2009," as well as McNeil's systemic quality assurance failures.  Id. at ¶ 186.  In short, Caruso's statements allegedly "created a materially misleading impression that J&J, through its initiation of voluntary recalls, was taking responsible steps toward ensuring product safety and transparency with

49

consumers." <u>Id.</u>

As with the other Defendants, Plaintiff alleges that Caruso failed to disclose the phantom recall and that McNeil was subjected to cost-cutting mechanisms that sacrificed quality. Lastly, Plaintiffs also point to Caruso's compensation package as further evidence of scienter. <u>Id.</u> at ¶¶ 254-55. As these two issues have been addressed in my analysis of the claims against the other Defendants, I need not repeat that analysis here but simply note that these allegations are insufficient to create a compelling inference of scienter.

In terms of Caruso's alleged statements, several of them are inactionable puffery. His comments that "our people did an excellent job in . . . keeping a rein on cost and being judicious about where we could make investments and where we can otherwise operate more efficiently," and that J&J was "making prudent investments that will grow our business for the long term," and that "the people of Johnson & Johnson always manage the business very well," are all vague and general statements of optimism that do not give rise to a duty to disclose. <u>See</u> <u>Kearns</u>, 691 F.Supp.2d at 617 ("[V]ague and general statements of optimism 'constitute no more than puffery and are understood by reasonable investors as such.'") (quoting <u>Advanta</u>, 180 F.3d at 538). As explained by the Third Circuit in <u>Advanta</u>, "[s]uch statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material: there is no 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix'

of information made available.'" No reasonable investor would have relied upon these statements.

A strong inference of scienter can be drawn from other alleged statements by Caruso, however.  Caruso allegedly stated in a May 11, 2010 conference call that "one thing to keep in mind is this is a very specific inspection of one manufacturing plant in our consumer business. *The comments by the FDA are very specific to that particular facility*. . . . And this particular instance and this particular recall is reflective of the conditions at the McNeil Fort Washington facility."  Am.Compl. at ¶ 199 (emphasis in original).  Plaintiff's allegation describes this statement with particularity by noting the substance of his statement and the date upon which it was made.  And, importantly, a reasonable construction of this statement is that it creates the impression that Caruso reviewed FDA correspondence prior to making the statement.

More to the point, Caruso's alleged statement brings the issues of cost-cutting and quality assurance into "play," thereby creating a duty to disclose McNeil's general quality control deficiencies, the phantom recall, the other recalls.  As the Third Circuit explained in <u>Shapiro v. UJB Financial Corp.</u>, 964 F.2d 272 (3d Cir. 1992), "where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play,' and "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to

speak truthfully." Id. at 282.[24]   Here, Caruso's statement was made in response to the analyst's question:   "In terms of providing a level of confidence that this is a McNeil-specific issue, what could you say to that in terms of giving people comfort that in the larger pharmaceutical business, you are comfortable with the quality systems that you have today and comfortable with your positioning?"   Am.Compl., ¶ 199 (emphasis added).   By responding to this directed question with the answer that "[t]he comments by the FDA are very specific to [the Fort Washington] facility," a plausible implication of Caruso's alleged statement is that McNeil does not have systemic quality assurance problems that extend beyond that facility.

Defendants argue that Caruso did not falsely represent the quality control problems because he also stated in that same May 11, 2011 call that "he didn't know yet if the issues were limited to McNeil."   Def. Open. Br. at 29, n.5 (citing page 4 of the May 11, 2010 Transcript of the conference call)   Indeed, the analyst on the conference call asked Caruso the following additional question: "[D]o you feel like you've identified the specific set of issues and therefore can have comfort that it, again, is a McNeil-specific issue?"   Phillips Decl., Exh. B at 4.   Caruso responded, "the timing of this and the ultimate resolution of the issues is as yet unknown because the investigation is still ongoing.   So I really can't comment any further on it."   Id.

_____

[24]      While Shapiro is an older Third Circuit decision, it is cited in the Circuit's more recent duty-to-disclose decision in Oran.   To be clear, the Oran court distinguished Shapiro on its facts.   By merely distinguishing Shapiro on its facts, the Oran court acknowledged the continuing viability of Shapiro's legal holding.   See Oran, 226 F.3d at 285.

In my view, Caruso's response does not relate to whether there are adequate quality control systems in place at McNeil but, rather, it relates to whether J&J's quality control problems are "McNeil-specific."  In other words, Caruso's response addresses whether there are additional subsidiaries that are experiencing quality control failures.  Therefore, that statement does not alter Caruso's earlier statement that McNeil's quality control problems were limited to the Fort Washington facility.

As the Supreme Court explained in Tellabs, a "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at 2504-05.  "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences."  Id. at 2510 (internal quotation marks omitted)).  Plaintiff's allegation that Caruso's statement brought "into play" the issue of McNeil's quality assurance program yet failed to disclose that there were additional problems beyond those at the Fort Washington plant is at least as plausible as any competing inferences that could be drawn from Plaintiff's allegations.

In addition, Plaintiff alleges that Caruso misrepresented in an April 20, 2010 conference call that the "OTC recall has not really impacted either physician recommendations or consumer preferences."  Id. at ¶ 184.  Plaintiff alleges in paragraph 187 of the Amended Complaint that this statement was misleading because, by omitting reference to the phantom recall, it fails to acknowledge the impact that recall had on consumer preferences.  It is plausible that Caruso's statement could be interpreted as misleading by an investor, and when considered in conjunction with

Caruso's statement about the FDA's concerns being limited to the Fort Washington facility, it further supports a finding that scienter is sufficiently alleged here. Indeed, these allegations, read in conjunction with all the remaining allegations against Caruso, lead me to conclude that Plaintiff has sufficiently alleged scienter with respect to Caruso.

### E.    J&J's Scienter

Having concluded that Plaintiff has sufficiently pled scienter with respect to at least one corporate officer, I further conclude that scienter has been pled against J&J. Accord In re Honeywell Intern., Inc. Securities Litig., 182 F.Supp.2d 414, 429-30 (D.N.J. 2002) (denying corporation's motion to dismiss where scienter properly pled against individual officer defendants).

### F.    Section 20(a) of the Securities Exchange Act

"The Securities Exchange Act of 1934 Section 20(a) imposes liability on controlling persons who aid and abet violations of the Act." Aetna, 617 F.3d at 285 (citing 15 U.S.C. § 78t). "Under the plain language of the statute, 'plaintiffs must prove not only that one person controlled another person, but also that the controlled person is liable under the Act. If no controlled person is liable, there can be no controlling person liability." In re Royal Dutch/Shell Transport Securities Litig., 380 F.Supp.2d 509, 565 (D.N.J. 2005). Thus, having concluded that Plaintiff sufficiently plead scienter with respect to Defendants Goggins and Caruso, who both were allegedly directly involved in J&J's decision making processes, I conclude that Plaintiff

has sufficiently alleged controlling person liability under Section 20 against those two defendants.  Accord Avaya, 564 F.3d at 230; In re Royal Dutch, 380 F.Supp.2d at 565.

## IV.   CONCLUSION

For the reasons expressed above, Defendant's motion to dismiss is granted with respect to Defendants Weldon and Luther and denied with respect to Defendants J&J, Goggins, and Caruso.  Plaintiffs are hereby granted thirty (30) days to file a Second Amended Complaint in accordance with the dictates of this Opinion.  An appropriate Order shall follow.

Dated: December 19, 2011

　　　　　　　　　　　　　　/s/  Freda L. Wolfson
　　　　　　　　　　　　　　Hon. Freda L. Wolfson, U.S.D.J.